Protection Board, and Appeal 3271, Fabizi Act v. United States Postal Service. On our argument list, we'll hear argument only in Minneapolis Community v. General Services Administration, Appeal 1440 from 2008. Mr. Nowin, good morning to you. Welcome to the court. Thank you very much, Your Honor. Please proceed. Thank you. May it please the court, Your Honor. This appeal boils down to four legal errors that were made by the Civilian Board of Contract Appeals in this decision. First, the board got off on the wrong foot by shifting the burden of proof to the wrong party as to the delay damages. It was a result of a misinterpretation of the contract and not applying the law. Second, the board compounded that legal error by making the city solely responsible for resolving an indemnification issue, ignoring the law of concurrent cause of delay. Three, the board further compounded this legal error by misinterpreting a very crucial section of the amended development agreement, section 1303, which required that the respondent, GSA, not only tell the contractor it had to work with the city and the MCDA, but also actually work in the early stages. That wasn't done and that led to the issues here. And finally, final issue independently, is that the board misread the contract to require that the city pay for $56,000 for underslab venting system, which was not required by the Minnesota Pollution Control Agency, as was the requirement in the contract. Do I understand you correctly then that you are not challenging fact findings by the board? We are only because of the misapplication of the burden of proof and some other things. Some of it actually is mixed law and fact. In particular, the issue of the indemnification agreement, that sort of mixes law and fact. We think that because the court was looking to the city of Minneapolis, and I'll refer to the cities collectively as the appellant. What I'm trying to get at is this. The board goes on at great length and great detail, 50 pages or so of fact findings. As far as I can understand it, there's no particular fact finding where you say that has to be reversed because even favorably read, whatever evidence supports that falls below the standard of substantial evidence. I didn't understand you to be attacking any particular fact finding. Am I wrong? I want to get this straight because I'm having a very hard time understanding what your arguments are and what they aren't. Let me see if I can put it this way, Judge Michelle, Chief Judge Michelle. The fact that went in with the burden being put on the appellants, we think colored the entire fact findings. As to specific fact findings that we think that have no substantial evidence, we would say that the issue of the indemnification agreement did not have substantial evidence and was colored by misinterpretation of the contract. Also, again, kind of a mixed law and fact issue is the section 1303 findings in that there was a determination that the GSA had complied with that section when in fact I think it's a misinterpretation of the contract and therefore more of a question of law. Yes, Your Honor. I guess it's both two and three, but where does the contract say that the city will only pay for its share of the delays? The contract as I read it says the city will pay for the delays, period. Your Honor. Where does it say it's only your share you're going to pay? It does not. It does not. The fact of the delay is a matter where the GSA is really standing in the shoes of the contractor because those are dollars going to the contractor. Very clearly, there's a reservation of rights to pay and obligation to have a blank check. I'm going to read the last two sentences of the board's opinion. In the agreement, in the amended agreement, appellants agreed they would bear these costs. When appellants deposited $2.4 million, they did no more than they had agreed to do. That's a pretty hefty finding against you. You agreed to do it and all your payment was was just meeting your obligations. We think, Your Honor, that that's a misstatement of the contract. Where is that statement wrong, those two sentences? In Section 1304, where there's an obligation to pay the cost of the modification and the delay, et cetera, there is also a reservation of rights under Section 11, which allows either party to go back and challenge that. 1304 required the city to, quote, pay the costs of the modification, including but not limited to, a list including delay costs and all associated management and inspection costs to GSA. They had to pay the delay costs, period, not a portion of them, all of them. But only those delay costs that were the responsibility of the city. Where does it say that? It says, pay the cost of such modifications, including but not limited to, blah, blah, blah, design, construction, overhead, profit, delay, associated management. There are no limitations such as you're now suggesting to us that only those that are with all due respect, Your Honor, I think there are for two reasons. Number one, that very amendment references Section 11, where there can be a challenge of something paid. You remember that the context of this is that there is a simultaneous remediation going on while there is construction. There is a calculation of delay costs, but that does not mean that there is an agreement that for all time, that those delay costs are paid by the city. There is an opportunity for challenge. Number two, Your Honor, there is also provisions of that very same contract, both Section 13, in other words, the amended development agreement and the original agreement that require that the parties, including GSA, do its best to keep those costs down. That's sort of the issue, if you will, Your Honor. There is a misinterpretation of the contract by the Board of Appeals. It is not, Your Honor, that that provision shifts the burden for all delay costs, no matter what, to the city. Original payment, yes, but ultimately there can be a challenge and that's precisely what the city did in this matter. But your right to challenge doesn't add a limitation to the obligation in the language Judge Rader read to pay for delay. Of course, you can challenge it, but you'll lose because the delay obligation had no limitations attached to it. Again, Your Honor, we think that the contract reads differently than that because although delay is included in that list, it is not a blank check. It allows for improper delay costs that have been assessed to be challenged. You would have us interpret the language to say delay if directly caused by the city or the state agency, but otherwise not. I'm comfortable with the language as is, but in fact, because of... Is that not what you're asking us to do? You're asking us to add some words after delay that would shrink the scope of the obligation? No, Your Honor. What the city, what the appellants are asking is that this court reverse the board because that provision requires that that money be paid, but it can be subject to a challenge, and it was paid in September subject to a board delay cost, but you can't challenge the nature of your responsibility to pay them if they are found, and the board found them. But the board found them by number one, misapplying the burden of proof, and number two... Where did they do that? Can you show me where they did that? I think it's at the appendix page 93 when they say the appellants have the burden of proving whether or not they should have any of the delay cost return, when in fact, in this situation where the delay costs come from a contractor, the black letter law is that it is the contractor or GSA in the shoes of the contractor that would have the obligation to prove the delay. I'm looking at that. It says appellants bear the burden of proving their case by preponderance of the evidence. That's true, isn't it? No. Well, it's not true as to the issue of delay costs and causation. No, it should be the flip side, as the appellant cited the coastal case. Now, to try and understand just what happened here, during the period of delay, was any work being done at all, or was that period entirely during the renegotiation with the construction company? There was a very little bit of work done by the subcontractor of the courthouse contractor, Your Honor, and then they stopped. So no work was being done, so these delay costs were, what, primarily the overhead of being on site when no work was being done? Overhead, profit, some, it's Minnesota, so there was some cost for heating in winter because of the change in the schedule, and it all added up to about $1.7 million. But the assessment which the city paid was made after the period of delay had ended, is that right? Yes, it was a matter of negotiation, and then the city had an obligation to pay, which they did, subject to their right to challenge. Now, didn't you really cause all the delay anyway because you didn't provide a clean site on November 1993, according to the agreement with GSA? You had to deliver a clean site on November 1993. You did not do it. You caused the delay anyway, didn't you? Well, again, Your Honor, with all due respect, there was an amendment to that agreement, and that's, you know, Section 13. We just talked about it. You're going to pay all the costs of the delay. But there was no, I mean... Probably because you caused it all, which is kind of the point I'm wondering if you could respond to. Your Honor, that's not accurate, because the amendment dealt with that issue. It wasn't as though there was a breach or you have to. There's nothing... Because you had to deliver a clean site on November of 1993. You did not do so, which is why you undoubtedly agreed to pay all the delay costs, because you caused them anyway, under the previous agreement. Your Honor, that's not the position of the counsel, what it boils down to, because there could have been some sort of claim from the original agreement, but instead there was a renegotiation, and there's nothing in that renegotiation that says that the city is responsible for the delay costs, other than this provision that addresses how we're going to pay it and then how we can challenge it. But Mr. Nowen, the board's findings, as I read them at least, specifically hold the city responsible for all the segments of delay, as a matter of fact, based on the proofs at the trial. So why would it matter on whom the burden was placed to prove their case? This isn't a case where you put on your evidence, the government puts on your evidence, and you put on nothing, and the board said you didn't carry your burden. This is a case where both sides put on lots of evidence. The board made lots of findings. The findings were all adverse to you on the causation of delay. They found the city responsible for every aspect of delay, as I read it. So it seems to me you can't prevail in this appeal unless you can persuade the court that critical findings supporting the ultimate decision here were based on less than substantial evidence. It looked to me like there was lots of evidence on every issue in both directions. So I don't see how you can win, especially since you don't seem to be directly attacking any of the evidentiary support for the various findings. We are and we aren't, as I tried to explain. Well, except to say that legal errors tainted the assessment of evidence. But you don't seem to squarely say the evidence supporting findings so and so was nonexistent, or was so pitiful that it was barely a scintilla. I don't see that anywhere in your argumentation. Well, of course, there's not numbered findings. It's a very lengthy... The pages have numbers. I understand that, Your Honor. But we do. We do in this sense. We made it clear in our briefing that as to the indemnity issue, there wasn't substantial evidence to put 100% of the responsibility on the city because of all the control that GSA had over its contractor during that time and the ability of them to either ensure or to have them proceed or because of the issues regarding the agreement to indemnify early, even though the agreement took some time. But this is what I'm trying to understand. The contractor refused to work during this period. And I'm just trying to... The delay was during the period of negotiation when the contractor refused to work without these conditions. And the contractor refused to proceed. Is that correct? That is correct, although one important thing is left out of that, Your Honor, if I may. And that is the violation of 1303, Section 1303 of the amended development agreement that required the city to get involved much earlier than during that three months or so of discussion, negotiation in the summer of 1994. But that is accurate. There were negotiations during that time. There was just nothing done. Even though GSA had control over its contractor, they were waiting for the city to indemnify is what it boils down to. Well, and no one's taken the position that the contractor had an obligation to work before all of this paperwork was clarified. But it did seem to me as if this was the city's strongest argument, well, you make it in your brief as well, that the work could have proceeded under some kind of insurance or some speedier negotiation, but you haven't suggested that there were delays in the negotiation. Is that right? Just that the work was not able to proceed because the contractor would not work without the additional assurance. Your Honor, Judge Newman, that is accurate, the latter part, that they wouldn't work without assurance. But we certainly... Their evidence was, and we don't think that the conclusion that the board drew that was all because of the indemnity agreement follows because of GSA's ability to instruct its contractor to work. Actually, the sub was the one that was blocking things. The insurance issue that was paid for, which is sort of belt and suspenders with the indemnity issue, and other reasons why there could have been work done during that time. Mr. Nowlin, what's wrong with this second paragraph in the conclusion of the board's opinion? It says, when it became clear that the STS system was not going to be able to remediate, the parties began discussing an amendment. GSA made clear that it would not pay any additional costs. The city acknowledged that developing a remediation system after award would be a change to the contract and said it would pay for the added costs caused by the change. Is that wrong? It is, your honor, in this sense, that ultimately those discussions... Did the city say it would pay for the change because it was responsible? The city agreed to the amended development agreement, your honor. And the city's interpretation of that is that we'll pay the money subject to the right to challenge. And that these delay costs are not appropriate to be charged to the city. That's what it boils down to, your honor. But it's not so that you can summarize facts. I mean, there was ultimately a contract entry between the parties. And in fact, during that intermediate period of time that they're talking about in that section of the order, there were discussions between GSA, the MCDA, and the city that said that the city, the MCDA, would be involved in all aspects of it from day one to make sure it's done efficiently and inexpensively. That didn't happen because 1303 was not complied with. Well, when you say that didn't happen, it's hard for me to agree with you on that. Did they meet every single day? No. Were there letters every single day for that whole period? No. Was there a lot of communication back and forth? Yes. I don't see how you conclude that there wasn't the consultation contemplated by the contract involving those agencies. This is how, your honor. There's an obligation that the GSA say in writing that BPT, the contractor, has to work with the city and the MCDA in developing their remediation plans. Number one, that didn't go out. But number two, BPT... The contractor and the subcontractor had copies of the agreement. The agreement repeated the same thing. What difference does it make whether a separate letter was sent quoting the contract when the contract itself was placed in the hands of the sub? Two things wrong with that, your honor. Number one, there's no evidence in the record that suggests it was read by either the contractor or the subcontractor. But more importantly, number two, it's not just the notice that's required by the contract. It's the obligation of the GSA's contractor and subcontractor to work with the city and the MCDA. My evidence of that is in the record at, I think it's page 456. There's all sorts of correspondence back and forth about the different remediation plans and what would work and what wouldn't work. It's not like these two parties didn't have communication about how to carry out the remediation. But judge, there was a blackout, or maybe more appropriate for today, a whiteout from about the end of March to the early June in those communications. And that time was all because ultimately they came up with plans that were disregarded immediately. And then it started the summer long process that Judge Newman has asked about regarding negotiation only a little bit of work. Mr. Nelson, once again, the board makes a finding directly against you on page 65. The record does not establish that BPT's cost would have been lower or that its work would have progressed faster if it had worked with STS and the city between March 18th and June 1st. And that, Judge Rader, wouldn't have changed a thing. The delay was already caused by the city and the city had already agreed to pay. Am I missing something? I think you are, your honor. I think that at least the board missed something. And what the board missed was that they misinterpreted the contract. Because when they talked about 1303, they thought the only obligation to meet earlier than June, essentially, was at the end of the process during the foundation, so like in September. And that is not what 1303 reads at all. There is an obligation to work on the remedy from the get-go. That's why this contract is immediately conveyed to the contractor. And that's what the language of that provision says. And that was what was left out, your honor. So I don't know if it's you or the board, but the position of the appellants is that it was a blank check on delay. It wasn't like a delay and we're not going to look at it, tell us what to pay. It was with eyes wide open. There were still obligations in the original contract and the amended contract to do things reasonably and inexpensively. And there was a check. And the check that we had negotiated was under section 1303, which had us involved from the get-go. And in those discussions at 456 of the appendix, your honor, there were discussions about indemnity back in early April. If that issue had been raised in early April, that would get those matters resolved. Let me just say in conclusion, your honor, I'm sure I'm well over time, that independent of all those issues, the only obligation in the contract that was negotiated was that things had to be done according to MPCA standards. And the slab, the venting, had nothing to do with MPA standards. It's something that had to be paid for, but not paid for by the city of Minneapolis. Thank you, your honors. All right. Thank you, Mr. Grote. May it please the court. Nice to see you back here. Thank you, your honor. It's been a lot of you over the decades. Thank you, your honor. Let me address three principal points today, and that is the effect of section 1304 of the amended development agreement. MCDA and the city's contention that the GSA breached an obligation to consult pursuant to section 1303 of the amended development agreement, and also the responsibility of the parties during the delay period in question, that is June through September, when construction was suspended and delay costs accrued. Let me turn first to the question of the effect of 1304. MCDA and the city's contention, as I understand it, is that section 1304, that is an obligation to pay for contract modification, including delay costs, did not modify the obligation between the parties. And that is best stated and most succinctly stated at page 12 of the reply brief, where in arguing against liability for the underslammed venting system, they state that. Mr. Grew, you can't really, and I think no one is saying, that this was an open-ended commitment, whatever happened, that the city would pay. Absolutely not, your honor. And the parties, the amended development agreement reflects an attempt to deal with the consequences of the fact that MCDA didn't remediate the property. But they weren't, their argument, is that they weren't the only people accepting that there was remediation still that had to be done. But the contractor refused to work and the delay occurred through a whole confluence of events, which in retrospect are all understandable. And the real question is, ultimately, who should bear the entire burden? Is it fair for the city to bear the entire burden? The contractor could have come in and continued to work, but he refused to, was entitled to refuse to. Is that the city's fault? That's false, your honor. The contention, the city, the board addressed this in its opinion. The government's delay expert determined that the driving factor in the delay was the city's refusal to provide indemnification. The board discusses that in detail. The board specifically held, as a matter of fact. Because that would have been an admission in advance of sole liability. Absolutely not, your honor. The question of indemnity arose because MCDA and the city insisted upon a remediation plan that would leave contaminated material in place. Under those circumstances, the subcontractor actually responsible for construction, Turner Construction Company, indicated that it would insist upon indemnification. As set forth in the board's decision. But isn't that what finally happened? Yes. And the board specifically determined that notwithstanding the fact that MCDA and the city agreed to provide indemnification early in these discussions, that these discussions were extraordinarily protracted. And that protraction was the responsibility of MCDA and the city. The driving factor here was the fact and the record is replete with an exchange between the party's attorneys in attempting to reach a satisfactory indemnification agreement. Turner took the... So that's clear. I agree with that. The question is, who bears or does the city bear the full burden of that delay? The board specifically determined as a matter of fact, the responsibility for this exchange rested with the city. Because they didn't say, yes, we'll pay $6 million instead of $3 million. No. Because they unreasonably delayed in providing the indemnity agreement that was the basis of this entire arrangement. The record, and I have the record with me, reflects numerous exchange between the party's agreements as they attempted to hammer out an indemnity agreement. The board found that the city reneged on its promise, or I won't say reneged permanently, but did not reasonably and quickly come forward with the indemnity agreement that was required. Turner Construction took the position that it shouldn't incur any permanent liability as the result of this agreement, because that was the understanding of the parties in going forward with the amended development agreement. When MCDA refused... Excuse me. When MCDA had failed to remediate the property, the parties were confronted with, could the project go forward with the existing funding? GSA let the bidding go forward and advised the contractors that there would be a separate amendment to the construction contract that would provide for contractor mediation. But the contractors, BPT Associates, which was the actual bidder, and Turner Construction agreed to this, and that's the basis upon which it went forward. Turner Construction and indeed BPT Construction insisted upon indemnification from the city, because the city's proposal was to leave contaminated property in sight, and everyone recognized the possibility of that creating liability. The board determined as a matter of fact that Turner Construction's insistence upon indemnification was reasonable and attributed the responsibility for the delay in ultimately coming up with that agreement to the city's failure to promptly provide an indemnification agreement. Well, it's true that complications arose, but I was thinking if in fact they had pulled out the groundwater and the building next door fell down, there'd be a much bigger problem than what we have now. I mean, there were complications and delays, and just the question is, is the entire burden of this on the city? That's exactly what the parties... The parties agreed that the entire delay, the financial obligation as the result of the failure to remediate the property was on the city. What happened here was there was a city parking garage that was getting some revenue during this point, and MCDA didn't promptly begin remediation efforts. The record shows the original efforts to do this remediation was $40,000. They didn't start the remediation efforts in time. The board determined as a matter of fact that they never communicated the date of the closing to STS, which was their... This is MCDA, never communicated the date the property had to be remediated to its environmental contractor. As the board determined, the environmental contractor for MCDA went ahead without that knowledge, came up with an environmental plan. As you mentioned, there were some problems with the environmental plan because of concern that water extraction might lead to foundation problems with an adjoining building. But the problem here, the driving problem was the failure to promptly institute a remediation plan, the failure to advise the environmental contractor, STS associates, of the need to have the property remediated by a certain date. Mr. Groat, there's a part of the board's opinion here that I have struggled with a bit. They're talking about the obligation of the contractor to work together with the city on the remediation plan. But they say there's no obligation to work together on remediation concepts. What's the distinction between... What's the basis for any distinction between a remediation concept and a remediation plan? Well, that comes, Your Honor, from the plain language of Section 1304. And I think the parties, as the board discusses... Yes, it says they have to work together on the plan. Well, the board kind of skirts around that obligation by saying, well, yes, but they didn't have to work together on concepts. Is there a difference between concepts and plans in the record we have before us? Well, I think, Your Honor, reference to Section 1303 explains what the board was talking about. And first, what the board said was that this was a design-build contract. And the contractor had the right to finalize his construction plans before entering into the remediation. And the problem with this was that you couldn't promptly begin environmental planning until the actual foundation plan for the building was finalized. Some of the proposals for this building actually required excavating all the topsoil at the site. And that isn't what was ultimately done in the environmental plan. But the environmental plan was ultimately driven by the construction plan. And the construction plan, at the time of the construction contract closing, hadn't been developed. This was a design-build contract. Now, they were excavating at the site, and at the same time, they were developing the underlying concepts and the specifics for the construction plan and the foundation. And 1303 addresses this. Because 1303 explains, immediately after award, advise in writing, the board held that was done. And then it goes on. The design-build contract of Section 1303 says, we'll develop a remediation plan, which may include but not necessarily be limited to, and goes on. Then, after the foundation design plan and remediation plan is formalized, these shall be shared with the city. Contrary to MCDA and the city's statement today, Turner Construction and BPT were not obligated to develop their building plan and remediation plan in concert with the city. The contract and the amended development agreement provides, very specifically, that the BPT, through its architects, would develop the foundation plan, when the foundation plan was finalized, then they'd go ahead and develop a remediation proposal, and that would be shared with the city, and the consultations would go on. 1303 specifically addresses the mutual rights and obligations in the party, and that's what the board addressed and held, and that explains the board's decision. Tell me about the underslab ventilation system. It's not required, and yet somehow the city ends up paying for it. As the board held, the underslab venting system was proposed by STS Associates, which was MCDA's environmental subcontractor, in this case, and rather than remove certain contaminated materials in place at the site, STS proposed and GSA and Turner went along with leaving those contaminated materials in sight. Leaving the contaminated materials in sight would result in hydrocarbons coming from the soil and being infiltrating a foundation. STS's proposal to address that problem was to have underslab venting. The board properly determined that the language of the amended development agreement, specifically section 1304, which provided for MCDA to pay the entire cost of a contract modification, included underslab venting, which was an integral part of the environmental plan developed by MCDA's contractors, STS. The need, if you would, for the underslab venting was driven by STS's determination it would be less expensive to MCDA and to the city to leave certain contaminated materials in place. Leaving those materials in place necessitated the underslab venting, and the board properly read section 1304 to require MCDA to pay the entire cost of a contract modification. Is it the case that if contaminated soil filled with hydrocarbons is going to be left in place as opposed to being removed and the building is going to be constructed on top of that contaminated soil, that venting is really the only option you have left at that point? Under the circumstances of this particular case, that's exactly what the STS concluded, and that's what their plan is based upon. And therefore, it's very rational for the board to conclude that the choice of the city to not require removal of the contaminant but leave it in place directly caused the need for the venting system. The board made specific findings in that regard in finding that the inclusion of the cost for underslab venting was appropriate in this case, because it was driven by a design decision that MCDA proposed through its environmental subcontractor, STS, in an effort to minimize the parties. Page 76, the cost of the underslab vent system were the direct result of the selection of a remediation effort which allowed contaminated material to remain at the site. And the evidentiary support for that, again, was the contractor's, the SES report. At which the board cites and which I have with the record here. But SDS proposed this as a less expensive alternative to remediate the site rather than the wholesale removal. There were other options. I mean, they could have... We're still looking at the assessment for delay. This is what we're concerned with. Yeah, I agree, Your Honor. The underslab venting is a relatively small part. The thrust of the claim is the additional costs incurred by Turner Construction as a result of the fact that there was environmental contaminants on the site. Has it been agreed throughout between the city on one hand and GSA on the other hand that Turner was entitled to insist on indemnification because of the failure of the city to turn over a clean land site? That's what the board... The board addresses the... Although the board addresses it, there were even more exchanges... Do you understand the city to be challenging that? The city's initial proposals, the board held, were not consistent with its initial undertaking to assume responsibility for indemnity. The government's delay expert determined that the critical path of the delay of some 94 days of the indemnity agreement, which underlied the agreement the parties reached in early June. The sense of that turns on the contractor having a right to insist on indemnity. If they had no right to insist on that, then the fact the city was slow in affording it wouldn't mean anything. Absolutely. And the board determined that the contractor was justified because the contractor could have proposed alternative environmental methods, indeed, initially did. And they were they proposed two proposals actually, your honor. And that one called for removal of all the contaminated material and the other called for leaving the material in place and working around it. The MCDA and the city specifically rejected both of Turner's proposals. The board determined as a matter of fact that the proposal STS developed after six or eight weeks was virtually identical to the proposal that STS that was presented at this original meeting by Turner Construction. So the board, the board determined as a matter of fact that MCDA and the city rejected the proposal that Turner initially set forth. Although it's not in the record. Wasn't that the proposal, wasn't that the five million dollar proposal just to wall it off? No, your honor. There were two proposals at the original meeting. One proposal was to leave material in place and the other proposal was to isolate the site. The board determined that Turner's proposal to leave the material in place, work around it, was essentially, I forget the exact phrase, identical is too strong, but very, very close to the proposal that STS ultimately developed. So in other words, what the parties eventually agreed to do in September was what Turner had proposed to do in June. And that is they essentially isolated, left material in place, took steps to make sure that the contaminated material didn't infiltrate into the water table underneath, which involved certain precautions that had to be made when they were putting in soldier piles. But this was the overall plan, if you would, that was eventually adopted, proposed by STS and put in place. The board found, as a matter of fact, was very similar to and completely consistent with the proposal Turner made in June. Mr. Grote, a question about the history of the case. It looked to me like the claim was presented to the contracting officer in 99 and I didn't see the date that it was denied by the contracting officer, but presumably not so much after submission. And then promptly an appeal from the denial filed with the board, but the trial didn't happen until 2007 and the findings weren't until the spring of 2008, 11 months after the trial. What the heck happened between 99 and 2007 when the trial was finally held? What was the board doing with this case? You know, and I have both benefit of the record and inquiries that I made that aren't apparent from the records. There were extensive efforts and attempts at settlement discussions. Seven or eight years worth of settlement discussions, that's an awfully long time. I mean, settlement is a good goal, but at some point you have to just say, well, look, we've tried and tried and tried and it's almost a decade and we can't reach agreement, so let's adjudicate for good. Let's try it. The explanation ends my understanding of what occurred, but I've made inquiries and I've reviewed the record and the grabment of the delay appears to be the result of the effort of the parties to achieve an amicable resolution. There was some motion practice, discovery, and other issues, but I can't address- You know, Mr. Groth, the record really does leave the impression, after all, the government, GSA, had the money. It wasn't as if there was an assessment of some sort. Absolutely not, Your Honor. The damages had been paid, had they not, in order for the work to go forward? Well, the amended development, the problem here was the government was constrained by the Antideficiency Act, and the government couldn't go forward with the contract and couldn't go forward with the modification because it didn't have the money. And the procedure that was developed in the amended development agreement required the contractor, excuse me, required CDC to make the deposit of the money for the modification. When they did that, then the government had the money to go forward with the modification and could do so and not violate the Antideficiency Act. The procedure that was adopted by the parties in the amended development agreement is explained by the constraints of the Antideficiency Act. The government didn't have the money when the contract was originally let to go forward with an environmental modification, and that's why they adopted this procedure of having MCDA actually deposit the money for the modification prior to the modification being issued. All right, we've given you a good deal of additional time as we did to Mr. Nowin, and Mr. Nowin will give you back the rebuttal time you sought to reserve, even though we jointly exhausted it. So you have up to five minutes. Thank you, Judge. Thank you. Let me start by responding to a question that you asked Judge Rader regarding the environmental concept versus the environmental plan. That part of the misreading of the contract by the board, because Section 1303 doesn't... The board talked about the plans for the environmental, but that's not what the 1303 says. It says in the first sentence, the design-build contractor immediately after award of the design-build contract will be advised in writing by GSA that its development of the design plans for the development of the project in the Plaza Garage will be prepared in consultation with GSA, MCDA, City of Minneapolis, etc. It's that word that's missing from what the board held, the word development. In fact, the development began at the end of March of 1994, and that's the point where the city and the MCDA was cut out of the process for a couple of months. The court only has to look at the record. I would direct it to Appendix 456, which I've already identified for the court, where there was a discussion then that we're going to need indemnification, but that was not brought up to the city or the MCDA. There was also a discussion about the broad plans for the site during that time. That's at Appendix 446, including preliminary plans for remediation of the site. That was brought up. Isn't it the case that the 90-day period of delay that is at the heart of the dispute here was over the summertime, not in the March to June time segment, but in the June to September time segment? Yes, Your Honor, and that's because the city and the MCDA did not get that 75-day early warning of the indemnification issues and these $5 million cleanup plans that were already on the table back at the end of March or early April. That's your version, but the critical path expert testified to the contrary, and his testimony was accepted by the board. It's not my version. That's where it gets to the mixed law, because I think that the board misread Section 1303, and that's an error of law. The contract can be interpreted by this panel when it said that there was only obligation to include the city and the MCDA during the plans time. In fact, it's during the development time. We think it's self-evident that that didn't happen and that led to this issue. Now, Your Honor, Chief Judge Michel, you also raise the issue of delivering a clean site. There was no obligation in the city of Minneapolis, the MCDA, to deliver a clean site back in December. It was only a site that was appropriate for building. In other words, it could have groundwater with petrochemicals below it. That's typical in these buildings. The building was built on exactly the kind of site that could have been conveyed back in November of 1993. Then the issue was raised, is the contractor entitled to indemnification then because of the way it went? The site wasn't clean in November, so there was a new contract amendment that was negotiated between the parties. The answer to that is no. They weren't entitled to a clean site, and therefore they're not entitled to indemnification because a clean site wasn't delivered. The whole concept here was public bodies... Why did the Minnesota authorities agree to indemnification if their view all along was that the contractor was not entitled to be indemnified because, in your view, a clean site hadn't been promised and wasn't being delivered? No problem. No indemnification justified. To get it moving, Your Honor. That's why on June 6th, I believe the date was, they agreed, OK, we'll provide indemnification. You're not entitled to it. In fact, the direction should be given by GSA to its contractor to move forward on this thing, but we will do it to get it moving. Then it took a long period of time. It wasn't a one-sided negotiation going on. There were multiple sides going on, but there was an agreement to indemnify from the very early stages. It could have been pushed back 75 days because that's the first time the indemnification issue was raised privately, if you will, without the information given to the MCDA or the City of Minneapolis. That's what it boils down to. That gets into the time period then of the summer and who's responsible for the delay. The GSA is standing in the shoes of the contractor as it pertains to the delay claim because it's delay money going to the contractor. Judge, you asked about what the court said about the burden of proof. They said at page 93 that appellants bear the burden of proving their case by preponderance of the evidence contained in our record. That's different than a situation that this court has addressed many, many, many times when a contractor comes in and says, look, we were delayed and we're entitled to X, Y, and Z. The court says, well, you have to prove that it's solely because of a certain delay. It can't be a concurrent delay. If it's not sold, then you're not entitled to recovery. Those are equitable adjustment cases. This is a breach case. It's not clear to me that the equitable adjustment cases apply here where we're talking about alleged breach. But, Your Honor, there is no allocation of burden in the contract. All it says is that the city has to the delay and the other expenses. They could have done that. They could have said you have the burden to prove it, but they didn't because in essence, it was forward looking. There was going to be the possibility of delay, not by the GSA, but by the contractor. That's forward looking. The way that's addressed time and time again, black letter law in federal claims is by proving sole delay and by having the burden on essentially the contractor. In this case, the GSA. In terms of who had exactly what burden to prove, it looks to me like both sides put in lots of evidence, documentary and testimonial. The fact finder weighed the evidence, some of which was on a burden of proof for its decision as opposed to depending on the content of the evidence, that it really wouldn't matter what was said about the burden of proof, correct or not, because the decision didn't rest on an allocation of a burden. It rested on an assessment of the evidence itself. But, Your Honor, the court starts their analysis by saying tell us of the burden of proof. Certainly true. Of their case, whatever that is. We've given you both lots of extra time. The case has lots of angles to it and we'll struggle with it further. We'll take it under advisement. We thank both counsels. Thank you very much.